NOT FOR PUBLICATION                          (Docket No. 32)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

_____ :
                                  :
ANTHONY HAYNES,                   :
                                  :
            Plaintiff,            :     Civil No. 03-3080 (RBK)
                                  :
      v.                          :     **OPINION**
                                  :
JAMES W. SMITH, as acting         :
Commissioner of the New Jersey:
Department of Human Services      :
et al.,                           :
                                  :
            Defendants.           :
_____ :

**KUGLER**, United States District Judge:

     This matter comes before the Court on motion by Defendants
James W. Smith, et al. ("Defendants"), for summary judgment of
the claims of Plaintiff Anthony Haynes ("Plaintiff"). For the
reasons set forth below, Defendants' motion will be granted.

**I.   Background**

     Plaintiff, a Patient Rights Advocate at Ancora State
Psychiatric Hospital ("Ancora"), is responsible for reporting and
investigating instances of patient abuse. This litigation arises
from the investigation and disciplinary actions taken against
Plaintiff in response to discrimination complaints filed by three
of Plaintiff's coworkers. Plaintiff alleges that the complaints
and ensuing investigation, charges, and suspension were

retaliation for his reports of patient mistreatment. The relevant chronology of events is as follows:

On October 22, 1999, Plaintiff reported to the Patient Services Compliance Unit that Nurse Patricia Smith ("Smith") was verbally threatening patient E.R.[1] Shortly thereafter, Plaintiff reported that Ancora employees, including Staff Clinical Psychologist Ellen Eisenberg ("Eisenberg"), were withholding food from patient F.P., preventing nurses from bringing him meal trays in order to force him to go to the cafeteria. In a third incident, in January 2000, Plaintiff confronted Program Coordinator Lynda Shannon-Gallagher[2] ("Shannon-Gallagher") about a newly instituted policy prohibiting patient "snack runs." After meeting resistance from Shannon-Gallagher, Plaintiff reported the new policy to the Acting Section Chief who immediately reinstituted the snack runs.

On January 28, 2000, Eisenberg filed a discrimination complaint with the New Jersey Department of Personnel, Affirmative Action Officer, alleging that Plaintiff discriminated against her based on sex and religion. In particular, she claimed that Plaintiff referred to her and Smith as "evil" and an "unholy alliance," spoke of her as "that Jew" to Shannon-Gallagher, and

---

[1] Patients' initials are used to protect their privacy.

[2] Shannon-Gallagher is alternately referred to as "Lynda," "Lynn," and "Lynne" in the caption and moving papers.

2

created a hostile work environment. (David K. Honness Cert. ("Honness Cert."), Pl.'s Opp'n Defs.' Mot. Summ. J. ("Pls.' Opp'n"), filed Sept. 22, 2005., Ex. 29.) Smith filed a discrimination complaint on February 2, 2000, alleging that Plaintiff called her a "nigger" in conversation with Shannon-Gallagher, referred to her as a member of the "unholy alliance," and was treating her poorly because of her sex, color, and race. (Honness Cert. Ex. 33.) Five days later, Shannon-Gallagher filed a complaint, alleging that Plaintiff yelled at her and would have treated her differently had she been a man. (Honness Cert. Ex. 34.) Because they were allegations of discrimination, the complaints were referred to the New Jersey Department of Human Services ("DHS") Equal Employment Opportunity/Affirmative Action Office ("EEO/AA") for investigation. (Terry O'Lone Cert. ("O'Lone Cert."), Defs.' Mot. Summ. J., filed Aug. 3, 2005, ¶ 3-4.)

The complaints were consolidated for investigation, and on March 27, 2000, EEO/AA Administrator Jerry Hall ("Hall") sent a report of the investigation ("Hall Report") to George Burgos, the Director of EEO/AA. In his report, Hall noted that Plaintiff verbally acknowledged using the terms "unholy alliance" and "evil," but denied calling Eisenberg "that Jew." Hall also found that Plaintiff had barged into a patient's Individual Habilitation Plan meeting and advocated Eisenberg's removal from the treatment team. Hall concludes that it was "not solidly

conclusive that [Plaintiff] used the term 'that Jew,'" despite Shannon-Gallagher's testimony, but that Plaintiff had violated the policy prohibiting sex discrimination, based on the absence of evidence of inappropriate professional behavior towards males. (Honness Cert. Ex. 35.)

The Hall report was submitted to Gregory Roberts, then-CEO of Ancora in May 2000. (Honness Cert. Ex. 45.) In an email to Susan Boehm on May 25, Roberts stated concern that the Hall Report did not justify its conclusion that the allegation of gender-based discrimination was supported. (Honness Cert. Ex. 36.) Soon thereafter, Roberts was transferred to a different hospital, and LaTanya Wood El ("Wood El") became the Acting CEO.

On June 22, 2000, Hall issued a revised report ("Revised Report") after interviewing several additional Ancora team leaders and psychologists, including seven males and one female, Valerie Carr. (Honness Cert. Ex. 52.) The Revised Report concluded that there was no support that Plaintiff had displayed inappropriate professional behavior toward males and that Plaintiff's "working relationship with Ms. Eisenberg was different from non-complainants interviewed." (Honness Cert. Ex. 52.)

In an inter-office memorandum dated July 19, 2000, Burgos instructed Wood El to review the Revised Report and notify the DHS office of appropriate sanctions. (Honness Cert. Ex. 37.)

4

Burgos noted that Hall's further investigation failed to substantiate gender discrimination, but that Plaintiff had admitted using the terms "evil" and "unholy alliance." The memo also notes that Shannon-Gallagher acknowledged hearing Mr. Haynes refer to Eisenberg as "that Jew" "on many occasions," and that Shannon-Gallagher offered "credible testimony" that Plaintiff had called Smith a "nigger." Burgos also states, incorrectly, that Plaintiff had acknowledged use of "that Jew"; however, a follow-up memorandum was sent shortly thereafter, noting that Haynes had *not* so admitted. (Michael O'B. Boldt Cert. ("Boldt Cert."), Defs.' Mot. Summ. J., filed Aug. 3, 2005, Ex. 41.)

Pursuant to Burgos' instruction, Terry O'Lone ("O'Lone"), Ancora's Employee Relations Coordinator, drafted charges against Plaintiff, recommending an Official Reprimand. David Zaleski ("Zaleski"), the DHS Director of Employee Relations, instructed O'Lone to revise the charges to separate out individual charges and propose ten day suspensions for each if sustained. Zalenski explained that an Official Reprimand would be inconsistent with the sanctions DHS had been imposing on a DHS-wide basis for similar offenses. (O'Lone Cert., Defs.' Reply, ¶ 5-6.)

Wood El signed off on the revised charges on September 11, 2000. (Burgos Cert. ("Burgos Cert."), Defs.' Reply filed Oct. 13, 2005, Ex. B, C.) Jesse Coleman, DHS Assistant Commissioner for Human Resources, sent Plaintiff written notice on September 14,

2000, that DHS concurred with the findings of the EEO/AA investigation. (Burgos Cert. Ex. D.) In response to this notice, Plaintiff telephoned the EEO/AA Office on September 18, 2000, asking what action would be taken. (Burgos Cert. Ex. E.) Ancora Deputy CEO Michael Bartfalvi, signed the three preliminary notices of disciplinary action that day, and served them on Plaintiff on September 20, 2000. The notices provided for ten day suspensions for each of three charges: calling Smith a "nigger," calling Eisenberg "that Jew" and saying she is "unholy," and referring to Smith and Eisenberg as an "unholy alliance" and "evil."

On September 19, 2000, Plaintiff contacted Senator Raymond J. Zane ("Senator Zane") with a complaint about patient mistreatment at Ancora. At around the same time, Eisenberg filed a second complaint alleging Plaintiff made hostile statements during a meeting on September 14. (Honness Cert. Ex. 43.)

On September 20, 2000, Wood El requested Plaintiff's supervisor to temporarily reassign him so that he would no longer be working the wards assigned to Eisenberg. The memo explains that an allegation had surfaced regarding Eisenberg and abuse of patient F.P. and that she wanted to "temporarily prevent interaction, and/or additional complaints from the involved employees until this matter can be reviewed." (Honness Cert. Ex. 39.) On September 21, Plaintiff's supervisor temporarily

reassigned him, providing for him to continue serving as a medication and general advocate in a different building. (Honness Cert. Ex. 42.) The reassignment lasted for "a few weeks." (Haynes Dep. 19:16-17, Boldt Cert. Ex. 19.)

On November 27, 2000, the charges against Plaintiff were heard before the Ancora Hearing Officer, Donald Webster. (Boldt Cert. Ex. 13.) Plaintiff was represented by a Union Representative. The Officer concluded that the charges of racial and religious slurs "could not be conclusively determined from the testimony offered at the hearing." However, the Officer found that Plaintiff did repeat derogatory remarks, including "unholy" and "evil," towards Smith and Eisenberg and advocated their removal from their positions, creating a hostile work environment. He also noted that the ten day suspensions were "neither the most lenient nor the harshest penalty" and were reasonable under the circumstances. (Boldt Cert. Ex. 13.)

Plaintiff served his twenty-day suspension during February, March, and April 2001. (Honness Cert. Ex. 45.) On November 16, 2001, Administrative Law Judge Stephen C. Reback heard Plaintiff's appeal of his suspensions. Judge Reback sustained two charges: one for using a religious slur of "unholy" and one for conduct unbecoming a public employee, each providing for a ten day suspension. (Honness Cert. Ex. 45.) Plaintiff then appealed the suspensions to the Office of Administrative Law ("OAL").

7

Without objection, Defendants voluntarily changed each charge to five days, considered a minor disciplinary action, which prevented Plaintiff from being able to retry his case before the OAL. (Honness Cert. Ex. 46; Pl.'s Facts ¶ 82-83.) The Merit System Board referred the matter to the Commissioner of Personnel.

On October 15, 2002, the State of New Jersey Department of Personnel found that the record did not support the finding that Plaintiff created a hostile work environment. The Department of Personnel did conclude that Plaintiff's conduct was unbecoming a public employee, but because there was no evidence that he was warned or counseled before the disciplinary action was taken, Plaintiff's penalty was reduced to an official written reprimand. The Personnel Department also found that Plaintiff had failed to substantiate his arguments that the charges were retaliatory. (Honness Cert. Ex. 47.)

## B.   Procedural History

Plaintiff filed a Complaint in the Superior Court of New Jersey, Law Division, Camden County, on January 31, 2002, against numerous defendants.[3] By Order of December 6, 2002, the Superior Court granted summary judgment of several counts for lack of a

---

[3] Plaintiff's Amended Complaint, filed March 2, 2002, lists fifteen named defendants and includes as a co-Plaintiff, Marguerite Frambes-Haynes, Plaintiff's wife. Frambes-Haynes voluntarily dismissed her claims on September 22, 2002.

tort claims notice. Plaintiff filed a Second Amended Complaint, adding claims under the First Amendment and 42 U.S.C. § 1983. Defendants subsequently removed the suit to this Court on June 27, 2003, and the parties stipulated to dismissal of several Defendants. Plaintiff now stipulates to the dismissal of all remaining claims and Defendants, save the New Jersey DHS, through its Commissioner James W. Smith in his official capacity, and Ancora Psychiatric Hospital, through its CEO Wood El in her official capacity. (Pl.'s Opp'n at 3-4.) Solely remaining are Plaintiff's claims under the Conscientious Employee Protection Act ("CEPA") (Count I), 42 U.S.C. § 1983 (Count II), and the New Jersey Law Against Discrimination ("NJLAD") (Count V).[4]

## II.  Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the

---

[4] Both parties are advised to consult the Local Rules of this Court. Defendants' reply brief exceeds the fifteen-page limit established in Local Rule 7.2(b). Equally lamentable, in an effort to advise the Court of Defendants' indiscretion, Plaintiff filed a sur-reply without permission, in contravention of Local Rule 7.1(d)(6). Although the Court will permit these briefs to stand, no further deviations from the Local Rules will be tolerated.

nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. <u>Celotex</u>, 477 U.S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. <u>Id.</u> at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Serbin</u>, 96 F.3d at 69 n.2 (quoting <u>Celotex</u>, 477 U.S. at 322); <u>Heffron v. Adamar of New Jersey, Inc.</u>, 270 F. Supp. 2d 562, 568-69 (D.N.J. 2003). "If the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly

probative,' the court must enter summary judgment in favor of the moving party." <u>Heffron</u>, 270 F. Supp. 2d at 69 (citing <u>Anderson</u>, 477 U.S. at 249-50).

## III. Analysis

### A.   Conscientious Employee Protection Act

Plaintiff alleges retaliation in violation of CEPA, N.J.S.A. 34:19-2(e). As anti-discrimination legislation, CEPA claims are analyzed under the burden-shifting framework articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). <u>Kolb v. Burns</u>, 320 N.J. Super. 467, 530-31 (App. Div. 1999). Plaintiff must first establish the four factor prima facie case: (1) he reasonably believed that his employer's conduct was violating either a law or regulation promulgated pursuant to law; (2) he performed a whistle-blowing activity described in N.J.S.A. 34:19-3a, c(1), or c(2); (3) his employer took an adverse employment action against him; and (4) there is a causal connection between the whistle-blowing activity and the adverse employment action. <u>Kolb</u>, 320 N.J. Super. at 476; <u>Blackburn v. United Parcel Service, Inc.</u>, 179 F.3d 81, 92 (3d Cir. 1999). Where plaintiff's alleged whistle blowing addressed a clear mandate of public policy as described in N.J.S.A. 34:19-3a(c)(3), the plaintiff "must first articulate the existence of a clear mandate of public policy which the employer's conduct violates." <u>Mehlman v. Mobil Oil Corp.</u>, 153 N.J. 163, 187 (1998).

11

Once the plaintiff establishes these factors, "the burden of persuasion is shifted to the employer to rebut the presumption of discrimination by articulating some legitimate nondiscriminatory reason for the adverse employment action." Kolb, 320 N.J. Super. at 478 (citing Andersen v. Exxon Co., 89 N.J. 483, 493 (1982)). The burden then returns to plaintiff to demonstrate that the proffered reasons were merely pretextual. Id. citing Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 551 (App. Div. 1995).

While the plaintiff need not provide direct evidence that his employer acted for discriminatory reasons, he must "point to sufficient evidence to support an inference that the employer did not act for its proffered non-discriminatory reasons." Id. (quoting Kelly v. Bally's Grand, Inc., 285 N.J. Super. 422, 432 (App. Div. 1995)). In particular, he "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.' " Id. (quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3rd Cir. 1994)) (citations omitted).

Defendants contend that the alleged acts are not "retaliatory actions" for the purposes of the CEPA statute and

12

that Plaintiff has failed to establish a causal connection between Plaintiff's alleged "whistle-blowing activity" and the adverse employment action.[5]

## 1.    Adverse Employment Action

Plaintiff claims that the investigation of the discrimination complaints filed by Smith, Eisenberg, and Shannon-Gallagher in January and February 2000, the ensuing suspension, and Wood El's decision to temporarily transfer Plaintiff to a different part of the hospital constitute "retaliatory actions" under CEPA.[6]

N.J.S.A. 34:19-2(e) defines "retaliatory action" as "discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." The Supreme Court of New Jersey describes "terms and conditions of employment" as "those matters which are the essence of the employment relationship." Beasley v.

_____

[5] Defendants also present numerous alternative arguments; however, because the Court now finds that Defendant is entitled to summary judgment on other grounds, the Court will not reach these additional issues.

[6] Plaintiff also appears to contend that Defendants attempted to conceal the alleged patient mistreatment in retaliation against him. However, Plaintiff offers no evidence or legal argument to explain how this alleged "cover up" of patient abuse could constitute an adverse employment action against Plaintiff. Accordingly, to the extent Plaintiff alleges a retaliatory cover up of patient abuse, Defendants are entitled to summary judgment.

Passaic County, 377 N.J. Super. 585, 608 (App. Div. 2005)
(quoting Township of West Windsor v. Public Employment Relations
Comm'n, 78 N.J. 98, 110 (1978)). CEPA prohibits adverse
employment actions that rise to the level of "serious intrusions
into the employment relationship," such as "length of the
workday, increase or decrease of salaries, hours, and fringe
benefits, physical arrangements and facilities, and promotional
procedures." Id. (citations omitted). A "pattern of conduct" can
also adversely affect the terms or conditions of employment
sufficient to qualify as retaliatory action. Id. at 609.

In contrast, neither "a minor sanction" nor "a condition on
continued performance of duties" amount to CEPA violations,
"absent evidence of adverse consequences flowing from that
condition." Klein v. University of Medicine and Dentistry of New
Jersey, 377 N.J. Super. 28, 46 (App. Div. 2005) (holding
requirement that doctor perform duties under colleagues'
observation not retaliatory action) (citing Hancock v. Borough of
Oaklyn, 347 N.J. Super. 350, 360-61 (App. Div. 2002)). Because
CEPA's purpose is not to "assuage egos or settle internal
disputes at the workplace," "[a]dverse employment actions do not
qualify as retaliation under CEPA 'merely because they result in
a bruised ego or injured pride on the part of the employee.'"
Beasley, 377 N.J. Super. at 607 (quoting Klein, 377 N.J. Super.
at 46).

Nothing in the record suggests that either the investigatory process of the complaints against Plaintiff or his temporary reassignment constitute adverse employment actions. While conceivable that a long term, pervasive investigation of allegations already found to lack merit could constitute a retaliatory pattern of harassment,[7] there is no indication of such a situation here. No evidence suggests the investigation was harassing or otherwise affected the terms or conditions of Plaintiff's employment. The record suggests only that Ancora forwarded the three discrimination complaints to EEO/AA, pursuant to a directive requiring EEO/AA investigations of all complaints of discrimination, and that EEO/AA conducted its investigation pursuant to its policies.

Further, despite Plaintiff's claims to the contrary, no evidence suggests Defendants found the complaints against him to be "baseless" or that Defendants repeatedly reopened the investigation. The Hall Report merely determined that the absence of any testimony, save that of Shannon-Gallagher, rendered the allegations of racial and religious slurs "not solidly

---

[7] New Jersey courts have noted that "[t]he definition of retaliatory action speaks in terms of completed action," such as suspension, and does not "encompass action taken to effectuate" the suspension. <u>Hancock</u>, 347 N.J. Super. at 359-60 (quoting <u>Keelan v. Bell Commc'n Research</u>, 289 N.J. Super. 531, 539 (App. Div. 1996). Consequently, the investigation leading to Plaintiff's suspension may not be cognizable as a retaliatory action under CEPA. However, because Defendants do not raise this argument in their motion, the Court will not reach this issue.

conclusive." Burgos, the Director of EEO/AA for the State of New Jersey, nevertheless found Shannon-Gallagher's testimony to be "credible," and instructed the Ancora CEO to draft charges. Moreover, the sole reinvestigation—the revision of the Hall report—occurred because the Ancora CEO was skeptical of the original report's finding of support for gender discrimination, and concluded that a more thorough investigation was necessary before Plaintiff could be charged.

Nor was Plaintiff's few-week[8] transfer to a different part of the hospital an adverse employment action.[9] (Boldt Cert. Ex.

---

[8] Plaintiff consistently characterizes this reassignment as a demotion, and states that Plaintiff was "removed from his position as Rennie advocate" and "banished from Ancora's main building for almost a year." (Pl.'s Opp'n at 17, 18.) However, all evidence in the record indicates that this was a brief reassignment, lasting only a "few weeks." (Boldt Cert. Ex. 19, 19:16-17.) Plaintiff's statements that he was removed for "ten months" or "a year" are unsupported by any evidence in the record and appear to be in error.

[9] Defendants argue that Plaintiff should be barred from bringing claims associated with his report to Senator Zane and his temporary transfer because Plaintiff's Second Amended Complaint alleges no facts associated with these claims. See Scott v. IBM Corp., 196 F.R.D. 233, 243 (D.N.J. 2000) (barring plaintiff from changing the focus of his Americans with Disabilities Act claim from a work limitation to a walking limitation for lack of notice in the complaint). Plaintiff argues that his allegations of retaliation for contacting the Senator were clear from depositions taken during discovery. However, questions during deposition are not a substitute for amending the complaint. See Luddington v. Indiana Bell Telephone Co., 796 F. Supp. 1550, 1579 (S.D. Ind. 1990) (finding plaintiff barred from raising new claims even though defendant was allegedly on notice of the claims from questions asked in deposition). Although leave to amend "shall be freely given," Plaintiff has not moved to amend his complaint, even though discovery is

16

19, 19:16-17.) Plaintiff presents no facts indicating that this transfer altered his duties, impacted terms and conditions of employment such as salary, hours, and benefits, or affected any other matter constituting "the essence of the employment relationship." See Beasley, 377 N.J. Super. at 607; Klein, 377 N.J. Super. at 46.

Unlike the investigation and temporary transfer, however, Plaintiff's twenty day suspension does constitute the kind of adverse action that could qualify as retaliatory action under this standard. Suspensions are explicitly provided for in the definition of "retaliatory action" articulated in N.J.S.A. 34:19-2(e), and go to the essence of the employee's ability to perform his job. Defendants cite to Hancock, 347 N.J. Super. at 361, for the proposition that a suspension does not constitute CEPA retaliation; However, Hancock merely concludes that a suspension resulting from a substantiated disciplinary charge, for reasons unrelated to the CEPA claim, does not constitute retaliation for the purposes of CEPA.[10] Id. Hancock does not

---

now closed and Plaintiff was obviously aware of the temporary transfer even prior to filing suit. Accordingly, although this Court now finds that Plaintiff's claims cannot survive summary judgment, in the alternative, the Court holds that Plaintiff is barred from raising new factual allegations that he was transferred or otherwise retaliated against due to his contact with Senator Zane.

[10] Although not explicit, Hancock's conclusion that the plaintiff's suspension was not cognizable as retaliatory action under CEPA appears grounded on the absence of a causal connection

suggest that a later-modified disciplinary action cannot
constitute retaliatory action. Accordingly, Plaintiff's
allegation of a retaliatory suspension could rise to the level of
retaliatory action under CEPA.

## 2.   Causal Connection

After establishing retaliatory action under CEPA, Plaintiff
must provide some evidence of a causal connection between the
action and the alleged "whistle-blowing." Kolb, 320 N.J. Super.
at 476. Plaintiff claims that the temporal proximity between his
complaint to Senator Zane on September 19, 2000, and the issuance
of the disciplinary notice on September 20, 2000, demonstrate the
necessary causal relationship.

However, the record establishes conclusively that the
disciplinary charges were written, signed, and communicated to
Plaintiff before Plaintiff contacted the Senator. Wood El signed
off on the charges on September 11, 2000, Coleman sent Plaintiff
written notice on September 14, 2000, and Plaintiff telephoned
the EEO/AA Office regarding the charges on September 18, 2000.
Moreover, all evidence indicates that the decision to charge ten
day suspensions rested solely with DHS Director of Employee

---

between the suspension and the whistle blowing, since the
suspension was found to be legitimate and deserved on
administrative appeal. The foundation for Hancock's conclusion,
then, is not that a suspension could not amount to a retaliatory
action, but that the suspension in that instance was clearly not
retaliatory.

Relations Zaleski, who specified that particular penalty to comply with the state-wide policy. Plaintiff points to no evidence that Zaleski's decision was in any way causally connected to Plaintiff's reports of patient abuse, and Plaintiff presents no support for his claim that Wood El or any Ancora personnel redrafted the charges in response to Plaintiff's September 19 complaint to Senator Zane.[11]

Lastly, Plaintiff was afforded a hearing before the Ancora Hearing Officer, who upheld two of the three charges. Specifically, the Officer found for Plaintiff on the issues of the racial and religious slurs, but concluded that, per his own admission, Plaintiff had used derogatory remarks, creating a hostile work environment, and that the recommended discipline of two ten day suspensions was reasonable under the circumstances. (Boldt Cert. Ex. 13.) No facts suggest a causal connection between the Hearing Officer's conclusion and Plaintiff's reports of patient mistreatment. See Hancock, 347 N.J. Super. at 361 (holding that where plaintiffs were afforded a hearing and found guilty of charges by a hearing officer, the ensuing discipline is

---

[11] In the alternative, this Court holds that the interest of maintaining state-wide consistency in discipline is a legitimate non-discriminatory reason for increasing Plaintiff's charges. Kolb, 320 N.J. Super. at 478. Because no evidence indicates Plaintiff was treated differently than any other similarly situated individual or that Defendants' reasons were merely pretextual, Defendants are entitled to summary judgment. Id. citing Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 551 (App. Div. 1995).

generally not actionable under CEPA). Defendants are therefore entitled to summary judgment.

## B.   First Amendment Claim

A public employee is entitled to constitutional protection for expressive conduct when (1) the conduct addresses "a matter of public concern" and (2) the value of the expression outweighs "the government's interest in the effective and efficient fulfillment of its responsibilities to the public." Azzaro v. County of Allegheny, 110 F.3d 968, 976 (3d Cir. 1997) (quoting Connick v. Myers, 461 U.S. 138, 150 (1983)). To establish a First Amendment violation, the employee must demonstrate that (1) he engaged in a protected activity, (2) the defendants took an adverse action against him, and (3) the protected activity was a "substantial or motivating factor" in the adverse action. Merkle v. Upper Dublin School Dist., 211 F.3d 782, 800 (3d Cir. 2000). The burden then shifts to Defendants to establish that they would have "taken the same action even in the absence of the protected activity." Id.

Plaintiff's Second Amended Complaint alleges that Defendants violated his First Amendment rights by penalizing him for using the terms "evil" and "unholy alliance." However, Plaintiff's brief in opposition to the present motion appears to concede that calling his coworkers "evil" and an "unholy alliance" was not protected speech. (Pl.'s Opp'n at 28.) Regardless, although

Plaintiff's complaints of patient mistreatment were in the public interest, the use of such language was not. Plaintiff provides no argument as to how name calling by a public employee in the workplace could "be fairly considered as relating to any matter of political, social, or other concern to the community," Connick v. Myers, 461 U.S. 138, 147 (1983). Accordingly, Plaintiff is not entitled to First Amendment protection for the use of "evil" and "unholy alliance."

While not alleged in his Complaint, Plaintiff also contends that his report of patient abuse to Senator Zane was protected speech, resulting in both the disciplinary charges against him and the temporary transfer.[12] As determined previously, no causal relationship exists between the disciplinary charges and the alleged "whistle blowing," since the charges were already completed and signed prior to Plaintiff's contact with the Senator. The temporary transfer, however, may well have been a response to Plaintiff's contact with the Senator since Wood El noted that the transfer was intended to separate Plaintiff and Eisenberg, allegedly the subject of that complaint. While there is some suggestion that this separation is due to Eisenberg's renewed complaint against Plaintiff, Plaintiff's complaint to

---

[12] As held previously, supra note 9, in the alternative, this Court finds that Plaintiff is now barred from raising new factual allegations, including the transfer, that are not alleged in the Second Amended Complaint.

21

Senator Zane may nevertheless have been "a substantial or
motivating factor" in Plaintiff's transfer, and Defendants are
not entitled to summary judgment for lack of causation. (Honness
Cert. Ex. 43, 39.)

Defendants argue that regardless of Defendants' motives for
Plaintiff's transfer, the temporary reassignment does not
constitute an "adverse action." For the purposes of the First
Amendment analysis, adverse actions are those that, "when viewed
in their totality, are likely to deter a person of ordinary
firmness from the exercise of his or her First Amendment
rights."[13] Zugarek v. Southern Tioga School Dist., 214 F. Supp.
2d 468, 476 (M.D. Pa. 2002) (quoting Rodriguez v. Torres, 60 F.
Supp. 2d 334, 350 (D.N.J. 1999) (adopting standard of circuit
majority in absence of Third Circuit precedent to the contrary);
Kadetsky v. Egg Harbor Tp. Bd. of Educ., 82 F. Supp. 2d 327, 337
(D.N.J. 2000). The reprisal need not amount to termination,
demotion, or failure to promote, Rodriguez, 60 F. Supp. 2d at
345, and a pattern of harassment may be sufficient. Zugarek, 214
F. Supp. 2d at 476 (citing Bart v. Telford, 677 F.2d 622 (7th
Cir. 1982)). However, not all unfavorable actions are cognizable
as First Amendment retaliation since "[i]t would trivialize the
First Amendment to hold that harassment for exercising the right

---

[13] The standard for an "adverse action" in violation of the
First Amendment differs from the threshold for a "retaliatory
action" under CEPA, requiring a separate analysis.

of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise." <u>Bart</u>, 677 F.2d at 625.

Under this standard, Plaintiff's temporary transfer to a different building, lasting only a few weeks, is not an adverse action. A transfer may be adverse where it involves a demotion or a "dramatic downward shift in [the] skill required to perform job." <u>Hutt v. Alford</u>, 1997 WL 158205, *2 (E.D. Pa. 1997) (citing <u>De Guiseppe v. Village of Bellwood</u>, 68 F.3d 187, 191 (7th Cir. 1995); <u>Dahm v. Flynn</u>, 60 F.3d 253, 257 (7th Cir. 1994)). However, where the transfer does not affect the "job description or terms of employment" and has no "objectively harmful or negative effects," it cannot be said that the transfer "was adverse or disparate." <u>Hutt v. Alford</u>,  1997 WL 158205, *2 (E.D. Pa. 1997) (holding that employee's transfer from one unit to another after filing charge is not an adverse action even though "humiliating" and involving a different kind of patient); <u>see also Dorsett v. Board of Trustees</u>, 940 F.2d 121, 123 (5th Cir. 1991) (holding transfer not adverse because plaintiff remained employed at university and grievances involved administrative matters and departmental procedures). Here, all evidence indicates that Plaintiff remained a patient advocate throughout the relevant period. Although he was advocating for different patients, Plaintiff presents no evidence that his duties were otherwise

changed, and Plaintiff was moved back to his prior location within a few weeks. Accordingly, Defendants are entitled to summary judgment for lack of evidence of any retaliatory adverse actions.

## C.   New Jersey Law Against Discrimination

Plaintiff, who is black, alleges that Defendants discriminated against him on the basis of his race and gender by giving a white female employee lighter discipline under similar circumstances.[14] In particular, he claims that a substantially similar situation arose in spring 2001, when Phyllis Federman ("Federman") filed a complaint regarding a conflict with her supervisor, Judy Nusbaum ("Nusbaum"). Federman, who is Jewish, claimed Nusbaum spoke to her in a loud and disrespectful manner and told her "to swear on the book you people swear on." Unlike Plaintiff, Nusbaum was not investigated or charged with discrimination, and was ultimately disciplined with only a Memorandum of Counseling. (O'Lone Cert. at ¶ 13.)

A claim for disparate treatment exists where "a member of 'a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an

---

[14] Plaintiff also appears to allege—for the first time in his opposition to Defendants' motion—a claim for retaliation because his "report that Smith had called an African American patient a 'nigger' qualifies as a protected act" under the NJLAD. (Pl.'s Opp'n at 39.) However, because the Court has already determined that Plaintiff presented no evidence of retaliation for this report, the Court will not address this argument.

impermissible criterion' under the anti-discrimination laws."
Mandel v. UBS/PaineWebber, Inc., 373 N.J. Super. 55, 74 (App.
Div. 2004) (quoting EEOC v. Metal Serv. Co., 892 F.2d 341, 347
(3d Cir. 1990)). In particular, "[d]isciplining some employees
more leniently than others for similar infractions may be
actionable as disparate treatment under the NJLAD." Jason v.
Showboat Hotel & Casino, 329 N.J. Super. 295, 303 (App. Div.
2000).

NJLAD claims receive the same burden-shifting treatment as
CEPA claims, described above. Id. Once the employee plaintiff
demonstrates a prima facie case of discrimination, "the burden of
producing evidence then shifts to the employer 'to articulate
some legitimate, nondiscriminatory reason for' the action." Id.
(quoting McDonnell Douglas, 411 U.S. at 802). The burden then
shifts back to the employee to show that the proffered legitimate
reason is merely a pretext and that "a discriminatory intent
motivated the defendant's actions." Id. (quoting McDonnell
Douglas, 411 U.S. at 804; Jamison, supra, 242 N.J. Super. at
445). Plaintiff can demonstrate pretext by revealing the
"weaknesses, implausibilities, inconsistencies, incoherencies, or
contradictions in the employer's proffered legitimate reasons for
its action [such] that a reasonable factfinder could rationally
find them 'unworthy of credence.'" Mandel v. UBS/PaineWebber,
Inc., 373 N.J. Super. 55, 75 (App. Div. 2004) (quoting Ezold v.

<u>Wolf, Block, Schorr & Solis-Cohen</u>, 983 F.2d 509, 531 (3d Cir. 1992)).

Defendants argue that even assuming a prima facie case of discrimination, they have articulated legitimate non-discriminatory reasons for the differing treatment of Nusbaum and Plaintiff. In a certification, O'Lone explains she did not refer the Nusbaum matter to the EEO/AA because Federman did not characterize her claim as one of discrimination or racial bias, and the conflict "appeared to arise out of a temporary situation between two employees with a long history of working well together." (O'Lone Cert. ¶ 10, 13.) The complaints against Plaintiff, however, "included allegations of racial and religious hostility, epithets, and unwelcome, hostile language repeated even after the complainants objected," and a Department of Human Services Employee Relations Directive required O'Lone to refer such complaints to EEO/AA. (O'Lone Cert. ¶ 13, Ex. A.) O'Lone also asserts that she treated the two circumstances differently because Plaintiff denied the allegations throughout the investigatory process, while Nusbaum never disputed Federman's complaint, was upset that she had offended Federman, and apologized during a meeting. (O'Lone Cert. ¶ 11.)

O'Lone's certification provides ample evidence of a legitimate, nondiscriminatory reason for treating the complaint against Nusbaum differently than the complaints against

Plaintiff. Plaintiff has provided no evidence or argument indicating that these reasons were pretextual. Accordingly, Defendants are entitled to summary judgment.

The accompanying Order shall issue today.


Dated: 3-2-06                     S/Robert B. Kugler
                                  ROBERT B. KUGLER
                                  United States District Judge


27